25 F.3d 1053
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Helen J. BYBEE, Plaintiff/Appellant
v.
PROCTOR COMMUNITY HOSPITAL Defendant/Appellee.
 No. 93-3932.
 United States Court of Appeals, Seventh Circuit.
 Argued May 13, 1994.
Decided June 3, 1994.
 
 Before CUDAHY, KANNE and ROVNER, Circuit Judges.
 
 ORDER
 I.
 
 1
 Beginning in 1973, when she was 42 years old, Helen Bybee worked as a licensed practical nurse (LPN) at Proctor Community Hospital in Peoria, Illinois. She worked the night shift (from 11 p.m. until 7 a.m.) for more than seven years, most of that time at the same station on the hospital's fourth floor, then known as 4-Southwest.
 
 
 2
 After working for six and a half years on the night shift at 4-Southwest,[1] a position opened up on the day shift. Bybee was then permitted to transfer (apparently because she had been on the night shift the longest) to the day shift (7 a.m. to 3 p.m.). She worked day shifts until 1988.
 
 
 3
 But in 1987 things began to change around the hospital. At that time, the 4-Southwest station was divided in two, the new stations being named 4-South (which became an oncology station) and 4-Central (which became a surgical station). Bybee was assigned to 4-Central.
 
 
 4
 Each station had a Patient Care Coordinator, who is essentially a head nurse in charge of staffing the station. In March 1988, a woman named Sue Gully became PCC of 4-Central. In May of that year, she and her counterpart in 4-South agreed that in light of the hospital's changing needs, a registered nurse (RN) from 4-Central (Amy Mauschbaugh) should be sent to 4-South; while an LPN from 4-South (Carol Roper) should be sent to 4-Central.
 
 
 5
 That swap left Bybee and Roper as the two LPNs on the first shift at 4-Central. Then, in the fall of 1988, Gulley decided that there were too many LPNs on the first shift, and wanted to trade a first-shift LPN for a third-shift RN. This decision was allegedly prompted by an increase in same-day surgeries.
 
 
 6
 Same-day surgeries are (logically enough) surgical procedures performed on the same day as admission. In order to perform such procedures, patients are admitted to the hospital in the wee hours of the morning, typically before the first shift begins at 7 a.m. There is a substantial amount of preparatory work to be done when the patient is first admitted, work for which an LPN is well suited and that does not require the greater expertise of an RN.
 
 
 7
 Gulley first asked whether either Bybee or Roper would volunteer to move to the night shift. She also asked one of the LPNs on the second shift (3 p.m. until 11 p.m.) if she would move to the third shift. When none of the three agreed, Gulley forced Bybee to transfer to the night shift, ostensibly because she had less seniority. While Bybee had less "hospital-wide" seniority then Roper, who had worked for some time as an aide before becoming a nurse, she had greater "nursing-wide" seniority, as well as of course greater seniority at the station ("unit seniority"). The hospital, it appears, had no formal seniority policy.
 
 
 8
 The transfer was particularly burdensome to Bybee, who was then turning 58 years old. In September 1987 her 22-year-old son (John) was in a car accident, having been rear-ended by a drunken driver. He was in a deep coma until January 1988, when he--though still semi-comatose--returned home.
 
 
 9
 Upon John's return, he needed 24-hour care. Bybee's husband took care of John during the day, but worked afternoons. Bybee--who was then working days--was herself responsible for caring for John during the night. She needed to be home at night because her husband, who is hard of hearing, could not hear the bell that they left by John's bedside and that he would ring when he needed assistance. Bybee testified that upon her transfer to the night shift they were unable to find someone to care for John at night, and that she therefore quit her job at Proctor. Bybee also testified at trial that her supervisors at Proctor, including Gulley, were well-apprised of her predicament. In addition, despite the suggestion that the hospital needed an additional LPN during the night shift, following Bybee's resignation Proctor did not replace her on the third shift with another full-time LPN (but rather with an RN).
 
 
 10
 Bybee attempted to seek redress through the hospital's grievance procedure, though to no avail. She then sued, claiming age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 621 et seq., which forbids discrimination in the terms of employment, against those aged 40 and over, on account of their age. The matter was tried to a magistrate judge, who found in favor of the hospital. The magistrate found, in written findings of fact, that:
 
 
 11
 24. Plaintiff, Helen Bybee, had the least amount of overall seniority, and thus was selected for the compelled change of shift. She refused the transfer and elected to retire.
 
 
 12
 25. I find that no evidence was offered on behalf of the plaintiff to substantiate her claim of age discrimination. Her case is based on her perception without proof.
 
 
 13
 26. I find that the defendant hospital has shown by credible evidence that the transfer of plaintiff was based on sound reasons and was not a pretext.
 
 
 14
 Findings of Fact, Conclusions of Law & Order for Judgment (Nov. 24, 1993) at 4.
 
 
 15
 Having found that Bybee failed to carry her burden of proving that she was discriminated against on account of her age, the court entered judgment in favor of the hospital. Id. Bybee here appeals that judgment, as 28 U.S.C. Sec. 636(c)(3) allows.
 
 
 16
 On appeal, Bybee makes essentially two arguments: that the court applied the wrong legal standard and that its findings of fact were clearly erroneous. But we discern no reversible error, and therefore affirm.
 
 II.
 
 17
 * Bybee first attacks the legal standard the court employed. She says that given "the extensive and overwhelming circumstantial and indirect evidence," the court must have read the recent Supreme Court decision in St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993), to "mean that Bybee may not use the indirect method of proof, which relies on circumstantial evidence, to prove that she was discriminated against and treated less favorably on the basis of her age." Br. at 31.
 
 
 18
 A plaintiff alleging intentional employment discrimination must prove discrimination either (1) directly, or (2) by the indirect method, which involves the three-step structured dance of burden-shifting set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that test, a plaintiff makes out a prima facie case by showing that while she was meeting her employer's legitimate expectations, she was treated worse than others who do not belong to a protected class. If the plaintiff makes out a prima facie case, the defendant can rebut it by articulating a non-discriminatory explanation for its employment decision. The plaintiff then bears the burden of proving that the nondiscriminatory reason is merely "pretextual"--that the actual explanation is discrimination.
 
 
 19
 The point of this is that the law acknowledges that it would be very difficult for an employee to put forward direct evidence of her employer's discriminatory motive, and therefore allows an inference of discrimination to be drawn where an ostensibly non-discriminatory explanation that the employer offers for its employment decision is shown to be pretextual. The last stage of the McDonnell-Douglas analysis thus requires the plaintiff to prove pretext.
 
 
 20
 A frequently arising question under this analysis is what happens if an employer comes forward with a non-discriminatory justification for its decision, and it turns out that explanation is a lie. The Court in Hicks said that proving that the employer is lying is not necessarily enough for the plaintiff to prevail. The factfinder is entitled to infer from the fact that the employer is lying--though it need not--that the actual reason for the decision is discriminatory. That, as we noted in Anderson v. Baxter Healthcare Corp., 13 F.3d 1120 (7th Cir.1994), was the law in this circuit even before Hicks, see, e.g., Visser v. Packer Engineering Assoc., 924 F.2d 655, 657 (7th Cir.1991) (en banc). It is true that there is some suggestion in Hicks that additional evidence of discrimination may be necessary before the factfinder can conclude that the actual reason was discrimination, but in Anderson we concluded that this language was dicta, and we therefore ignored it. Anderson, 13 F.2d at 1124 n. 3.
 
 
 21
 But the point of this three-step burden shifting analysis is to provide an orderly way for the court to evaluate the evidence on the question of discrimination. The ultimate question of fact remains the same: whether "the defendant intentionally discriminated against the plaintiff." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). And the factfinder asks this question "directly, just as district courts decide disputed questions of fact in other civil litigation." United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715-16 (1983); see also, Kier v. Commercial Union Ins. Companies, 808 F.2d 1254, 1257 (7th Cir.1987).
 
 
 22
 Bybee is therefore mistaken in contending that the court refused to allow her to use the indirect method of proof. At the end of the trial the finder of fact concluded that Bybee failed to satisfy her burden of proving that the hospital's proffered reason for transferring her was pretextual. "I find that the defendant hospital has shown by credible evidence that the transfer of plaintiff was based on sound reasons and was not a pretext." Findings of Fact, Conclusions of Law & Order for Judgment (Nov. 24, 1993) at 4. Bybee's real complaint is with this factual determination. There is no credible suggestion, however, that the court employed the wrong legal standard or refused to allow her to take advantage of the indirect burden-shifting method of proof.
 
 
 23
 Nor is there merit to her related argument that the court erroneously found that she failed to make out a prima facie case. It is clear (and Proctor admits) that Bybee did make out a prima facie case of discrimination. It is also clear that Proctor articulated a nondiscriminatory justification for its decision: Bybee had the least hospital-wide seniority. The question therefore boiled down to whether the nondiscriminatory reason was pretext, that Bybee was actually forced to transfer because the hospital was discriminating against her on the basis of her age. Again, the court made a factual determination that it was not. Bybee's only recourse on appeal therefore is to take issue with this factual finding. And she does.
 
 B
 
 24
 Bybee insists that the court's factual determination is clearly erroneous. She argues that the testimony of the hospital employees was contradictory, a fact which she says "greatly diminished the credibility of their testimony." Br. at 40. She also points to the testimony of Shirley Suits, Susan Gulley's predecessor as head nurse at the Four-Southwest (and later Four-Central). Suits testified that Bybee's work exceeded all expectations in her years as an LPN (a fact that no one disputes), and further testified that she felt that she had herself been discriminated against on the basis of her age when she was terminated in 1988 (she was almost 50 years old at the time).
 
 
 25
 Proctor counters this by denying that it discriminated against either Suits or Bybee on the basis of their age. Rather, Proctor insists that Suits was terminated "for reasons related to her managerial skills," Br. at 26, and that Bybee was forced to transfer because she had the least hospital-wide seniority. It further argues that the choice of what type of seniority system to use is a business decision that is not subject to second guessing by the courts. Br. at 20.
 
 
 26
 This claim overstates its case. If Proctor used hospital-wide seniority, rather than nursing-wide or unit-wide seniority, in order to disadvantage Bybee--and did so on account of Bybee's age--it would have violated ADEA and would liable for damages. But the hospital is correct in saying that federal law otherwise does not prevent it from adopting whatever type of seniority system it wants. Its decision can be based on legitimate business reasons, on the quirks of its managers, or on the alignment of the stars. But it cannot be a smokescreen for an attempt to discriminate on the basis of age. The ultimate point in this case is that the finder of fact determined that the policy choice represented a legitimate business decision, and was not pretext to disguise discriminatory motivation.
 
 
 27
 Bybee points to some evidence that supports the opposite conclusion. It is clear that both sides had some support in the record for the ultimate conclusion they were asking the court to draw. Deciding disputed questions of fact is a matter left for the exclusive province of the factfinder, whose decisions are not subject to appellate review save for cases of clear error. See Fed.R.Civ.P. 52(a). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). Rather, a finding is clearly erroneous only when the "reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395 (1948). See also Hughes v. Brown, No. 93-1948, slip op. at 5 (7th Cir. Mar. 31, 1994). Deference is particularly appropriate where (as here) the factfinder hears the testimony of witnesses and accordingly makes credibility determinations. Id. at 4-5; cf. Santa Fe Pacific Corp. v. Central States, Southeast and Southwest Areas Pension Fund, Nos. 93-2736 & 93-2899, slip op. at 4 (7th Cir. Apr. 22, 1994) ("We can reject the district judge's factual inferences from testimony only if they are clearly erroneous, but they do not have the additional insulation from appellate review that determinations of credibility enjoy.").
 
 
 28
 In this case, there was evidence on both sides of the issue, and the factfinder ultimately believed the defendants' witnesses who testified that the decision was made for neutral business reasons. That determination is perhaps not the only one supportable in the record, though it undoubtedly has a reasonable basis therein. That being the case, we will not second-guess the court's conclusion. Because we have no "definite and firm conviction that a mistake has been committed," we affirm the judgment below.
 
 
 
 [1]
 The record is less than clear about when this transpired. Bybee testified that it was in 1988, though this is a mathematical impossibility, and it appears she misunderstood the question. The district court found that she worked night shifts "for a while" at 4-Northeast (the testimony at trial describes it as "a couple of years") and then for six and a half years at 4-Southwest. This most likely leaves us sometime between 1979 and 1982. The precise resolution of this factual dispute, in any event, is inconsequential to the disposition of this appeal